### Trimble et al. v. Gordon.

(Decided Nov. 5, 1937.)

477

TAYLOR & MILAM, and SELDON Y. TRIMBLE, IV. for appellants.

JOHN A. WHITAKER and O. M. SMITH for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On April 26, 1934, this equity action was filed in the Logan circuit court by appellants and plaintiffs below, H. L. Trimble and C. H. Ryan, against appellee and defendant below, Jettie T. Gordon. The relief sought by plaintiffs against defendant was the location of a dividing line between plaintiffs and defendant as owners of adjoining tracts of land so as to have it adjudged that plaintiffs were the owners of 12 or 13 acres of land in contest and over which the respective litigants were in irreconcilable dispute. The background to the litigation—but which serves no purpose in the settlement of the controversy—is that in 1878, and prior to the transactions hereinafter related, Ben K. Tulley, was the owner of a large tract of land in Logan county. He became financially involved to a considerable extent, and he sold and conveyed all of his land except 160 acres— the proceeds of which sales went to the liquidation of his debts. His residence was located on the south end of the retained 160 acres which fronted on the Clarksville and Russellville pike, the southeast corner of the retained tract being at the junction of that road and the Cave Spring and Buena Vista road. The proceeds of the sales that he made were not enough to extinguish his debts, some if not all of which had been reduced to judgment. An execution was raised on the judgment or judgments for the unpaid balance, and the sheriff levied it on the 160 acres not sold by the debtor. In due time

he made sale, under that levy, of enough of the 160 acres off its south end to satisfy the execution, and Mrs. Belle Tulley, wife of Ben K. Tulley, became the purchaser thereof.

On May 28 of the same year the sheriff executed to Mrs. Tulley a deed in which the portion of land she bought under the execution sale by metes and bounds (in each call of which distances, corners and directions are stated) was similarly described, and it is recited that the quantity sold contains "about 60 acres more or less." The price agreed to be paid seems to have been met by Mrs. Tulley, and she and her husband and their family, one of whom was the defendant, Jettie T. Gordon, continued thereafter to live upon, occupy, and cultivate the entire 160 acres until her death in 1921; but with her owning the title to the quantity she bought under the execution off the south end of the whole tract, and her husband owning the north end thereof. The husband died in 1885, leaving a will in which he devised his portion of the entire tract to his wife during her life, and at her death to their children. So that, after the death of the husband in 1885, his widow continued to occupy the entire tract without change in possession, management, or operation throughout the period of her life. It appears that Mrs. Tulley also executed a will in which she designated her daughter, the defendant below and appellee here, as executrix thereof. The mother died owing some debts and plaintiff as executrix of her mother's will—as well as one of her heirs and devisees—filed an equity action in the Logan circuit court to not only sell the lands of her mother (being the parcel the latter bought at the sheriff's sale in 1878), but also that of her deceased father lying north thereto, which latter tract was sold for division among the heirs as remaindermen under the will of the husband and father.

A sale was ordered by the court in that action of two bounded and described parcels of land going to make up the entire 160-acre tract, the northern one bounded and described as containing 100 acres and the southern one (likewise described) as containing 60 acres. After due advertisement, the master commissioner, who was ordered to make the directed sales, did so, and he reported that plaintiffs became the purchasers of the northern parcel of the 160 acres which he described by metes and bounds in accordance with the judgment of the court ordering the sale, and that defendant became

the purchaser of the remaining southern portion of the 160 acres, also described in both the judgment and the commissioner's report. Later he executed deeds to the respective purchasers conforming to his reports of sale and in which the respective tracts of land sold and conveyed by him were each meticulously described by metes and bounds. The old Tulley residence and outbuildings were located on the portion purchased and conveyed to defendant, except a small shackling barn that had been removed from the place where it was originally constructed on that parcel to a point farther north, and which latter location turned out to be within the boundary of land later conveyed to plaintiffs by the master commissioner.

Some years before the death of Ben K. Tulley he planted a hedge fence across the 160-acre tract at a point along its north and south course, which divided his entire farm into two tracts. The one north of the hedge contained 88 acres, and that lying south of it contained 72 acres. After the decretal sales in 1922, following the death of Mrs. Belle Tulley, plaintiffs sold 88 acres off the northern end of their purchase at the decretal sale— it being the north end of the Tulley 160-acre tract—to a couple of vendees named McCormick, and which extended the southern line of that conveyance to the hedge, but which still left plaintiffs owning 12 acres of the tract described in their master commissioner's deed lying immediately south of the hedge. That 12 acres was not purchased by the McCormick's because it became known that defendant, Mrs. Gordon, was claiming to own it under her master commissioner's deed, upon the theory that the land that she bought off the south end of the 160-acre Tulley tract extended north to that hedge, and which, if true, as we have seen, would vest in her the title to 72 acres of the entire 160-acre tract instead of the 60 acres described by metes and bounds in the deed she obtained from the master commissioner. In the circumstances the McCormicks declined to purchase that contested strip and plaintiffs declined to sell or convey it, since their sale of it might later be held champertous, and their vendees declined to become involved in that controversy.

Plaintiffs by their petition herein sought to have it adjudged that they were the owners of the contested quantity of land, consisting of 12 acres more or less, which they averred defendant asserted title to. The

answer contained a denial and an averment that plaintiff owned the small contested parcel because, as she contended, her north line extended to the hedge referred to. She also interposed a plea of adverse possession of the contested strip by herself and her mother for a period of more than 15 years, which ripened the title of the contested land in her; notwithstanding the master commissioner's deed executed to her did not embrace it. Following pleadings made the issues and after evidence taken the cause was submitted to the court for hearing, followed by a judgment dismissing plaintiffs' petition, and to reverse it they prosecute this appeal.

The learned trial judge did not file an opinion, and his judgment dismissed plaintiffs' petition without reciting the grounds upon which the order was made. However, it is recited in briefs, which is not denied, that his reason for doing so was that he was of the opinion that defendant had sustained her plea of adverse possession. We have concluded that the reason so advanced must be the correct one so influencing the court, since all the proof shows that the described boundaries that the master commissioner made to the respective purchasers at his sale (plaintiffs of the northern portion of the 160-acre tract and defendant of its southern portion) did not locate the dividing line between them at the hedge referred to, but on the contrary it was located south of the hedge so as to give to plaintiffs 100 acres and to defendant 60 acres, although the description in her deed is some less than that quantity.

From what we have said it is clear that neither the master commissioner, nor the parties purchasing at his sale since then, ever marked the line separating the two tracts into which the entire farm of 160 acres was divided, and which that officer sold under the judgment in the equity settlement action brought by defendant hereinbefore referred to. She introduced numbers of witnesses to prove, and to which she also testified when giving her testimony, that her mother, from and after the sheriff's execution sale to her in 1878, took possession of and claimed to own all the land up to the hedge, and she insists that when she purchased from the master commissioner in 1922 she obtained all the land up to that hedge as the successor in title of her mother whom she contended enlarged her holdings so as to embrace the contested 12 acres in the manner stated, i. e., by adverse possession. In the first place, if such adverse posses-

sion was acquired by Mrs. Tulley, it either began before or after her husband's death in 1885. There is no testimony whatever to show that any such alleged adverse holding began during the first period. Wherefore, if there were any such adverse holding by Mrs. Ben Tulley, it began after her husband's death and while she owned a life interest in his land lying north of her 60 acres which she obtained under the sheriff's execution deed in 1878.

Much argument is made, and some cases are cited, to sustain that defense under different facts, but we find nothing in the record that would justify it here. Mrs. Ben Tulley after the death of her husband continued to occupy the farm in the same manner as had been done by herself and husband before his death. She held, operated, and controlled the entire farm as a unit, although her title thereto consisted of two separate estates, i. e., a fee-simple title to 60 acres off its southern portion, and a life interest in the remaining 100 acres of its northern portion. Adverse possession does not run in favor of a life tenant against the remainderman without some clear positive overt act, or express notice. It is doubtful if the record supports any such character of adverse holding by Mrs. Tulley of the contested strip, since she did nothing more than engage in the exercise of the usual and ordinary acts of ownership and rights of possession, control, and management—all of which were possessed by her under her respective titles. We therefore conclude that the alleged adverse possession by Mrs. Tulley before her death was, perhaps, not established by the proof, and that, if the court in rendering its judgment concluded otherwise, it was possibly incorrect.

But, according to our interpretation of this record, it is entirely immaterial whether Mrs. Tulley before her death adversely held the contested strip for the necessary period to ripen title in her, or whether she did not do so. Our reason for that conclusion is that the rights of the parties hereto are governed and are to be determined by the description of the land in the deeds that the master commissioner executed to them respectively. Those deeds—executed in conformity with the judgment of sale rendered by the court—started the title to the respective purchasers afresh and created a new beginning of titles and rights of possession whereby each purchaser became the owner of the quantity of land

described in his or her deed, regardless of who owned the lands prior thereto. Defendant herein, as we have seen, procured the judgment to be rendered by filing an action for the specific purpose of obtaining it. She purchased at the commissioner's sale one specifically described parcel ordered to be sold at her instance, and plaintiffs purchased the other one. She, by and through the master commissioner, was one of the vendors to plaintiffs in the deed which that officer executed to them, and in which he recited that he was selling to them "100 acres more or less," and which was described therein by metes and bounds, as we have stated. The surveyor's calculation, according to the calls of that description, gave plaintiffs slightly more than 100 acres, but they are not insisting on any greater quantity in this action. Defendant in the same manner joined in the deed executed by the master commissioner to herself where she was conveyed "60 acres more or less," which was also likewise described by metes and bounds, and which the surveyor calculated to be a fraction less than 60 acres, but plaintiffs appear to be making no claim to the shortage necessary to make her quantity fully equal to 60 acres.

Therefore, the titles of the respective parties litigant in this case are rooted in the conveyances made by the master commissioner pursuant to the judgment of the court authorizing and directing the sale, regardless of what might have been the condition of the title to the lands sold prior to that time. There can be, according to our interpretation of the facts, no other logical conclusion to be drawn therefrom, and which has the effect to make the starting point of any alleged adverse holding in this case against plaintiffs as commencing at the time of the execution of the master commissioner's deeds. That being true, if it should be conceded (and which, perhaps, is true) that defendant began to claim and to adversely hold the contested strip, lying between her true northern line and the hedge referred to, immediately upon receiving her deed from the commissioner, and that she continued thereafter to do so, then the period of such adverse occupancy at the time of the filing of this action was short of that necessary to acquire prescriptive title, since her occupancy had at that time been only for a period of 12 years. There is no plea or even contention of any estoppel in this case; but, if there were, there are no facts upon which it could be

sustained, and the same may be said as to laches, on the part of plaintiff, even if the defense had been relied on and had been proven by the testimony, since it did not operate in any manner to the detriment of defendant, and which fact is necessary to perfect that defense. Neither has defendant made any effort to reform or correct the descriptions contained in either deed so as to conform to her constructions placed thereon, even if such a remedy was open to her and it was still available.

All of the cases and authorities cited by counsel for defendant are differentiated from the facts of this case because of the interrupted occurrence of the court sales made by the master commissioner, as hereinbefore pointed out, and which fact, as we have attempted to show, renders the cited cases inapplicable. On the other hand, our conclusion as to the effect of that decree, and the commissioner's deeds made pursuant to the sales made by him as directed by it, is supported by sections 396 and 397 of the Civil Code of Practice, and cases cited thereunder. The court, therefore, erred in dismissing plaintiffs' petition. It should have located the line south of the hedge a sufficient distance to include 12 acres of land whereby plaintiffs would obtain the 100 acres described in their deed and defendant would also thereby obtain the full 60 acres mentioned in her deed.

For the reasons stated, the judgment is reversed, with directions to render one in conformity herewith; the whole court sitting.